# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN CYRUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 12 C 10248 |
| | ) | |
| UNION PACIFIC RAILROAD COMPANY, | ) | Judge John Z. Lee |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Kevin Cyrus unsuccessfully applied for several promotions during his tenure at Union Pacific Railroad Company ("Union Pacific"), and Union Pacific eventually terminated him. Cyrus has sued Union Pacific for race discrimination and retaliation in violation of 42 U.S.C. § 1981 ("section 1981") and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and retaliation in violation of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109. For its part, Union Pacific contends that other applicants were more qualified for the promotions Cyrus sought and that it terminated Cyrus due to unsatisfactory work performance. Union Pacific has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants Union Pacific's motion.

## Local Rule 56.1

Motions for summary judgment in the Northern District of Illinois are governed by Local Rule 56.1. "The obligation set forth in Local Rule 56.1 'is not a mere formality.' Rather, '[i]t follows from the obligation imposed by Fed. R. Civ. P. 56(e) on the party opposing summary judgment to identify specific facts that establish a genuine issue for trial.'" *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (quoting *Waldridge v. Am. Hoechst*

*Corp.,* 24 F.3d 918, 924 (7th Cir. 1994)).  The Seventh Circuit has "routinely held that a district court may strictly enforce compliance with its local rules regarding summary judgment motions." *Yancick v. Hanna Steel Corp.,* 653 F.3d 532, 537 (7th Cir. 2011).

Local Rule 56.1(b)(3)(B) requires the nonmovant to file a "concise response to the movant's statement that shall contain […] a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." LR 56.1(b)(3)(B).  Local Rule 56.1(b)(3)(C) also "requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement […] of any additional facts that require the denial of summary judgment.'" *Cichon v. Exelon Generation Co., LLC,* 401 F.3d 803, 809 (7th Cir. 2005) (quoting Local Rule 56.1).

The failure of a nonmoving party to comply with these requirements carries significant consequences.  "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."  Local Rule 56.1(b)(3); *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."). "This rule may be the most important litigation rule outside statutes of limitation because the consequences of failing to satisfy its requirements are so dire." *Malec v. Sanford,* 191 F.R.D. 581, 584 (N.D. Ill. 2000).

Union Pacific argues that Cyrus has not complied with Local Rule 56.1 in his response to Union Pacific's statement of undisputed facts.  While the Court denies Union Pacific's request to strike Cyrus's Local Rule 56.1 response in its entirety, where Cyrus has failed to comply with the

rule, the Court has so noted and has deemed that statement of fact admitted. For example, Cyrus failed to admit or deny Union Pacific's fact statements in paragraphs 15, 17, 24, 27–29, 32, and 42, and accordingly those facts are deemed admitted. In addition, Cyrus failed to provide a citation to the record to support his denial of Defendant's paragraphs 36 (second and third sentences), 46 (first sentence), 52, and 68.[1] Accordingly, those assertions that lack a citation to the record have not been considered for purposes of this motion and, to the extent that Cyrus's denial was completely devoid of any citation to the record, Defendant's corresponding statement of fact has been deemed admitted. In addition, Cyrus failed to file a Local Rule 56.1(b)(3)(C) statement of additional facts. Thus, in the event that Cyrus attempts to include additional facts in his response to Union Pacific's statement of undisputed facts, such additional facts will not be considered by the Court. *See, e.g.,* Pl.'s LR56.1(b)(3)(B) Stmt. ¶¶ 36 (second and third sentences), 46 (first sentence).

## Factual Background

Union Pacific hired Cyrus, who is African American, as a Manager of Yard Operations ("MYO") in July 2007. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 1, 8, 54. From July 2007 through January 2012, Cyrus's immediate supervisor was Keith Hamilton, Director of Terminal Operations, who is Caucasian. *Id.* ¶¶ 8, 12, 27.

Cyrus alleges that Hamilton engaged in abusive conduct throughout his employment. *Id.* ¶ 56. Cyrus asserts that, upon first meeting Hamilton in 2007, Hamilton stated, "You are not my choice and you're not my kind." *Id.* In 2009, when Cyrus was seeking a promotion, Cyrus also contends that Hamilton stated, "You're not going to move until you get my blessing to move" and "David Giandinoto is going to do what I recommend." *Id.* ¶ 60. In addition, Cyrus states

---

[1] The Court further notes that Cyrus's response to paragraph 68, which incorporates his response to paragraphs 32 and 36, does not support a denial of the fact statement.

that Hamilton addressed him in a violent, threatening, and intimidating manner, used derogatory (but not race-based) language, and violated his personal space in 2010. *Id.* ¶ 38.

### A. Cyrus's Complaints

Cyrus filed numerous complaints with Union Pacific regarding Hamilton. In 2009, Cyrus first informed Rick Rivera, Assistant Vice President of Risk Management, and Melissa Schop, the Manager of Equal Employment Opportunity, that Hamilton treated Caucasian employees more favorably than African-American employees. *Id.* ¶ 37.

On February 8, 2010, Cyrus informed David Giandinoto, the General Supervisor of the Chicago Service Unit, and a representative from Value Lines about an incident in which Hamilton had threatened and intimidated him. *Id.* Value Lines is a Union Pacific complaint hotline for reporting business conduct issues, including workplace discrimination, retaliation, or harassment. *Id.* ¶ 38. In these reports, Cyrus did not indicate that he believed that his race was a factor in Hamilton's behavior. *Id.*

On September 28, 2011, Cyrus informed Rivera that on September 26, 2011, after a train collision involving railroad workers Cliff Embry and Sam Halloway, Hamilton would not release Embry or Halloway until he obtained their statements about the collision, thus delaying their medical treatment. *Id.* ¶ 41. Cyrus also reported this alleged delay in medical treatment to Schop in January 2012. *Id.* ¶ 46.

On November 2011, Cyrus notified Hamilton of a derailment involving an all-Caucasian crew. *Id.* ¶ 45. Cyrus did not report the collision incident to any other supervisor. *Id.* ¶ 47. Cyrus states that one of his subordinates, whose identity he cannot recall, complained to Cyrus that he believed that the Caucasian crew was disciplined less harshly than an all-African-American crew that had previously been involved in a similar accident. *Id.* ¶ 45.

## B. Plaintiff Unsuccessfully Sought Promotions

Cyrus alleges that he applied for twenty-six promotions. *Id.* ¶ 65. The statements of facts submitted by the parties, however, provide specific details only regarding two potential promotions to Continuous Improvement Manager and one to Manager of Terminal Operations. *Id.* ¶¶ 66–67.[2]

On October 18, 2010, and March 9, 2011, Cyrus interviewed for the position of Continuous Improvement Manager, which was based in Omaha, Nebraska. *Id.* ¶ 67. Cyrus admits that he was not hired for the openings because the hiring manager, whom Cyrus is unable to identify, stated that Cyrus was not competitive with the best candidates. *Id.*

In January or February 2012, Cyrus applied for a promotion to a Manager of Terminal Operations position, but he was denied an opportunity to interview for the job. *Id.* ¶ 66. Cyrus admits that he does not know who was hired in his stead or the qualifications or experience of the selected candidate. *Id.*

Without providing specifics, Cyrus avers generally that Roy Cramer, Andre Drostof, and Andy Mader, who all worked under Hamilton and are Caucasian, were promoted to other positions, whereas Cyrus was not. *Id.* ¶¶ 59, 62, 63. It is unknown whether Cyrus applied for the positions to which Cramer and Drostoff were promoted. *Id.* ¶¶ 62–63. Although Cyrus applied for the position that Mader obtained, the parties' statement of facts do not provide any information regarding the position's prerequisites or Cyrus' and Mader's respective qualifications. Def.'s Ex. 1, Cyrus Dep. at 388–89.

---

[2] On April 30, 2012, Cyrus filed a complaint with the Occupational Safety and Health Administration ("OSHA"), alleging that Union Pacific retaliated against him by denying him promotions. *Id.* ¶ 50.

### C. Cyrus Is Placed on a DAP and Then Terminated

As an MYO, Cyrus was required to participate in Union Pacific's Field Training Exercise ("FTX") program. *Id.* ¶ 18. The FTX program monitors employees' knowledge, application, and compliance with Union Pacific safety rules and federal regulations and requires MYOs to perform FTX tests (also known as events). *Id.* To perform an FTX test or event, an MYO conducts standardized observations or structured simulations that involve testing railroad operations, viewing safety behaviors, and inspecting the workplace. After an FTX test or event is performed, an MYO is required to timely report the test results. *Id.* Each month, an MYO is required to perform, and assist other managers in performing, a certain number of tests or events to ensure that Union Pacific complies with Federal Railroad Administration regulations. *Id.* Cyrus was required to perform twenty FTX events and five assists per month. *Id.* ¶ 20.

Every manager is routinely audited to determine whether he or she is complying with the FTX program. *Id.* ¶ 26. In November 2011, Steve Foresman, the Director of Road Operations, conducted a routine audit of Cyrus's FTX performance for the period from July 1 to October 31, 2011. *Id.* The audit revealed that Cyrus failed several FTX reporting requirements in three areas: (1) eighteen tests were added to Union Pacific's reporting computer that had no corresponding FTX debriefing forms; (2) thirteen tests did not include proper managerial or employee signatures; and (3) debriefing forms for fourteen tests were completed but not entered into the computer, as required. *Id.*

On February 11, 2011, Giandinoto sent Cyrus a letter informing him that he failed to meet his monthly FTX testing requirements and to conduct five assists per month. *Id.* ¶ 24. Giandinoto emphasized that compliance with administering FTX testing was one of Cyrus's critically important safety duties. *Id.* ¶ 25.

In January 2012, Giandinoto demoted Hamilton to the position of Corridor Manager, removing him as Cyrus's immediate supervisor. *Id.* ¶ 13. In February 2012, Renaldo Smith, an African American, became Cyrus's new supervisor. *Id.*

Smith wrote an email to Giandinoto on February 20, 2012, requesting that Cyrus be placed on a Developmental Action Plan ("DAP") to address his failure to comply with the FTX program's requirements. *Id* ¶ 27. Giandinoto approved Smith's request, and Smith placed Cyrus on a DAP on March 27, 2012. *Id* ¶ 31. The DAP outlined specific performance goals for Cyrus, including meeting with Smith every Monday to review his safety activities; performing four FTX events per week and one Remote Control Operation ride per week; submitting all ride sheets and FTX forms for review each week; and completing all Employee Development Reviews by April 30, 2012. *Id.* ¶ 32.

During the DAP period, Giandinoto reviewed Cyrus's progress with Smith and concluded that Cyrus was not satisfying the terms of his DAP. He had failed to conduct FTX ride tests, failed to submit FTX debriefing forms, and made computer input errors in his FTX reports. *Id.* On June 2, 2012, Giandinoto notified Cyrus of his termination. *Id.* ¶ 35.

### Legal Standard

Summary judgment is proper in cases where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Once the movant has sufficiently demonstrated the absence of a genuine issue of material fact, the non-movant must then set forth specific facts demonstrating that there are disputed material facts that must be decided at trial. *Id.* at 321–22.

**<u>Analysis</u>**

## I. Race Discrimination

Cyrus brings race discrimination claims under both section 1981 and Title VII. Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Title VII precludes employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "Although section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 940 (7th Cir. 1996).

There are two ways for a plaintiff asserting race discrimination to defeat a summary judgment motion. *See Adams v. City of Indianapolis,* 742 F.3d 720, 735 (7th Cir. 2014). He may present either (1) direct or circumstantial evidence of discrimination (the "direct method") or (2) indirect evidence that establishes a *prima facie* case and satisfies the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801–02 (1973) (the "indirect method"). *See id.*

In response to Union Pacific's summary judgment motion, Cyrus apparently concedes that he cannot proceed under the direct method because he solely argues that his race discrimination claims survive under the indirect method. *See* Pl.'s Mem. Resp. Summ. J. 11.

Under the indirect method, a plaintiff must establish a *prima facie* case of discrimination by showing that: (1) he is a member of a protected class; (2) he was satisfying his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated

employees outside his protected class were treated more favorably. *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009).

In the context of a failure to promote, a plaintiff establishes a *prima facie* case by showing that: (1) he is a member of a protected class; (2) he applied and was qualified for the position he sought; (3) he was rejected for that position; and (4) the employer promoted someone outside of the protected class who was not better qualified than the plaintiff. *Grayson v. City of Chi.*, 317 F.3d 745, 748 (7th Cir. 2003). All four prongs of a *prima facie* case must be satisfied. *McGowan*, 581 F.3d at 579.

Once a plaintiff makes this *prima facie* showing, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 454 (7th Cir. 1999). If a defendant articulates such a reason, the burden shifts back to the plaintiff to show that the stated reason is a pretext. *See id.* A pretext is defined as "a lie, specifically a phony reason for some action." *Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 983 (7th Cir. 1999).

Cyrus alleges that he was terminated and denied promotions based on race. The Court addresses each in turn.

### A. Termination

Because it is undisputed that Cyrus has satisfied the first and third prongs of the *prima facie* case, the Court focuses on the second and fourth prongs. In other words, the Court must determine whether Cyrus has created a triable issue of fact regarding whether he was meeting Union Pacific's legitimate expectations and whether similarly situated employees outside his protected class were treated more favorably.

## 1. Legitimate Expectations

With respect to this factor, the Court views Cyrus's "job performance through the eyes of [his] supervisors at the time of" the adverse employment actions. *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 689 (7th Cir. 2008). In doing so, the Court is mindful that it should not second-guess employment decisions by acting "as 'super-personnel' to question the wisdom or business judgment of employers." *Id.*

It is undisputed that Giandinoto terminated Cyrus on June 2, 2013, based on Cyrus's failure to meet the terms of his DAP.[3] Defs.' LR 56.1(a)(3) Stmt. ¶ 35. Cyrus's supervisor, Smith, and Giandinoto placed Cyrus on a DAP because an FTX audit conducted in late 2011 indicated Cyrus had failed to comply with FTX reporting requirements from July 1 to October 31, 2011. *Id.* ¶ 26. Specifically, the audit showed that Cyrus failed several FTX reporting requirements in three ways: (1) eighteen tests were added to Union Pacific's reporting computer that had no corresponding FTX debriefing forms; (2) thirteen tests did not include proper managerial or employee signatures; and (3) the debriefing forms for fourteen tests were completed but not entered into the computer. *Id.* Furthermore, it is undisputed that Giandinoto told Cyrus that adhering to FTX reporting requirements was one of Cyrus's critically important safety duties. *Id.* ¶ 18.[4] Moreover, it is undisputed that this was not the first time that Cyrus had been told that he had failed to satisfy the requirements of the FTX program. *Id.* ¶¶ 22–23. Based on the undisputed facts in the summary judgment record, Cyrus has not established a triable issue regarding whether he was legitimately meeting Union Pacific's expectations.

---

[3] The Court notes that under Title VII, an implementation of a performance improvement plan is not an adverse employment action. *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011).

[4] Although Cyrus contends he was not well-trained in FTX compliance and his prior supervisor did not emphasize FTX testing, this does not refute that Smith and Giandinoto believed it was a critically important function of his job.

### 3. Similarly Situated

A similarly situated employee is "a comparable employee who dealt with the same supervisor, was subject to the same standards, and engaged in similar conduct without additional circumstances that would differentiate the two." *Reed v. Innovative Health & Fitness Ltd.*, 259 F. App'x 875, 879 (7th Cir. 2008). Cyrus points to John Fusek and Keith Hamilton as similarly situated employees who received more favorable treatment than he.

The following facts regarding John Fusek are undisputed. Fusek, a Caucasian, was also an MYO whom Hamilton and later Smith directly supervised and whom Giandinoto indirectly supervised. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 8, 12, 57–58. Because Fusek failed to properly conduct FTX tests, Smith and Giandinoto placed him on a DAP. *Id.* ¶ 58. Giandinoto ultimately terminated Fusek after he failed to satisfy the terms of his DAP. *Id.* Because the undisputed facts show that Fusek did not receive more favorable treatment than Cyrus, Cyrus cannot rely on Fusek to satisfy this prong of the *prima facie* case.

As for Hamilton, there are two sentences in Union Pacific's statement of facts that relate to Union Pacific's treatment of Hamilton: (1) "In early 2012, Giandinoto demoted Hamilton to the position of Corridor Manager."; and (2) "By th[e] time [Cyrus was placed on a DAP], Hamilton had been demoted and was working as a Corridor Manager." *Id.* ¶¶ 13, 27. But these statements, in and of themselves, are insufficient to show that Hamilton was similarly situated.[5]

---

[5] Cyrus asserts in response to paragraph 36 of Union Pacific's statement of facts: "With respect to discrimination based upon race, Mr. Cyrus was not aware of the evidence developed throughout the lawsuit establishing that Giandinoto transferred Hamilton, who failed his DAP, but terminated Cyrus for allegedly failing his DAP. This creates a factual dispute as to whether Hamilton and Cyrus are comparators for disparate treatment based on race reporting to the same supervisor under the same discipline policy." Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 36. However, because Cyrus fails to cite any evidence in support of these assertions, he has failed to comply with Local Rule 56.1 and cannot rely on them.

To determine whether two employees are similarly situated, "a court looks at all the relevant factors, which most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications." *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003). Except in an extraordinary case, "it will not be the case that a plaintiff is similarly situated to another employee when the plaintiff is subordinate to that employee." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 366 (7th Cir. 2009) (quotation omitted).

Although Hamilton and Cyrus both reported to Giandinoto (albeit Hamilton directly and Cyrus indirectly), the similarity ends there. Hamilton's job description is not part of the summary judgment record, but even if it were, it would be unreasonable to infer that Hamilton, as Cyrus's supervisor, had the same job description as Cyrus. In addition, Cyrus fails to show whether Hamilton and Cyrus had comparable experience, education, and other qualifications and whether Union Pacific subjected supervisors to the same standards as their subordinates. Lastly, although Cyrus intimates that Hamilton was demoted after being placed on a DAP, the parties' statements of fact lack any information regarding why Hamilton was being placed on a DAP or Hamilton's performance after being placed on a DAP. Due to the paucity of information regarding Hamilton, it is impossible for the Court to meaningfully compare the two. Cyrus has thus failed to create a triable issue of fact regarding whether Hamilton was a similarly situated employee.

### 4. Pretext

Even if Cyrus could make out a *prima facie* case, he has not established a genuine issue of fact regarding whether Union Pacific's reason for terminating him was a pretext for race

discrimination. "The focus of the pretext inquiry is whether the proffered reason is a lie." *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002–03 (7th Cir. 2013). In order to demonstrate pretext, a plaintiff must "present sufficient evidence that the proffered reasons for the termination had no basis in fact, that they did not actually motivate [the employer's] decision, or that they were insufficient to motivate the decision." *Lesch v. Crown, Cork & Seal Co.,* 282 F.3d 467, 473 (7th Cir. 2002). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011).

Cyrus has not met this burden to demonstrate pretext. Cyrus argues that Union Pacific's failure to conduct a formal conference with Cyrus before placing him on a DAP indicates pretext because it did not comply with Union Pacific's three-step disciplinary process. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 19. Because the summary judgment record shows that Fusek, a Caucasian employee, was also placed on a DAP for similar FTX reporting deficiencies without holding a formal conference, Cyrus cannot rely on Union Pacific's noncompliance with its disciplinary policy to show that his nonperformance was a pretext for race discrimination. *Id.* ¶¶ 29, 58; Def.'s Ex. C, Smith Decl. ¶ 19.

Cyrus also seeks to invoke the "cat's paw" theory,[6] arguing that, although Smith and Giandinoto did not have a discriminatory animus, Hamilton did, and Hamilton intentionally influenced them to terminate Cyrus.[7] "[T]he 'cat's paw' metaphor refers to a situation in which

---

[6] "The term 'cat's paw' derives from a fable conceived by Aesop . . . . In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, 416 n.1 (2011).

[7] *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 36 (citing Def.'s Ex. B, Cyrus Dep. 323–24 (Q. "What's your understanding of who made the decision to terminate your employment? A. David Giandinoto and

an employee is fired . . . by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012).

The cat's paw theory is inapplicable here. Having been demoted and moved to another position, Hamilton was no longer Cyrus's supervisor when Smith and Giandinoto placed Cyrus on a DAP, and there is no evidence that Hamilton influenced Smith's decision to place Cyrus on a DAP or Giandinoto's decision to terminate Cyrus for not satisfying the terms of his DAP. *See* Pl.'s LR 56.1(b)(3)(B) ¶ 13 (failing to respond to Union Pacific's fact statement that Smith and Hamilton never had a discussion about Cyrus); *id.* ¶ 27 (failing to respond to Union Pacific's fact statement that Hamilton was not involved in the decision to put Cyrus on a DAP and was not aware that Cyrus was put on a DAP until December 2013). More importantly, Cyrus concedes that Hamilton had no input into the decision to terminate Plaintiff. *Compare* Def.'s LR 56.1(a)(3) Stmt. ¶ 70, *with* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 70.

Cyrus has failed to create a genuine issue of material fact as to whether he was meeting Union Pacific's expectations, whether a similarly situated person who is not African American was treated more favorably, and whether the reason for his termination was disingenuous. The Court grants summary judgment in Union Pacific's favor on Cyrus's race discrimination claim based on his termination.

**B. Denial of Promotions**

In addition, Cyrus alleges that Union Pacific discriminated against him based on race by denying him promotions. Again, he chooses to establish this claim under the indirect method. Because it is undisputed that Cyrus satisfies the first and third prongs, the Court again focuses on

---

Renaldo Smith. Q. Do you believe that both of them made the decision based upon your race? A. No.")).

the second and fourth prongs, *i.e.*, whether Cyrus applied for and was qualified for the positions he sought, and whether Union Pacific promoted someone outside the protected group who was less qualified than he.

While Cyrus alleges that he applied for promotions to twenty-six positions, the parties' statements of facts only provide details about two Continuous Improvement Manager positions and a Manager of Terminal Operations position. *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 66–67; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 66–67. Regardless of whether the Court focuses on these specific positions or all twenty-six, however, Cyrus has not pointed to any of his own qualifications that would indicate he was well positioned to meet the criteria for the positions for which he applied. *See id.* Furthermore, he provides no evidence that those promoted over him were less qualified due to their credentials or work experience. *See id.*

Cyrus does aver generally that Roy Cramer, Andre Drostof, and Andy Mader, who worked under Hamilton and are Caucasian, were promoted to other positions, whereas Cyrus was not. *Id.* ¶¶ 59, 62, 63. But Cyrus does not know whether he applied for the positions to which Cramer and Drostoff were promoted. *Id.* ¶¶ 62–63. Additionally, although Cyrus applied for the position that Mader obtained, the parties' statement of facts do not provide any information regarding the position's prerequisites or Cyrus' and Mader's respective qualifications for the position. Def.'s Ex. 1, Cyrus Dep. at 388–89. Cyrus has thus failed to satisfy the second and fourth prongs of the *prima facie* case as to the denial of promotions.

 Even if Cyrus could establish a *prima facie* case, however, he still fails to create an issue of fact as to whether Union Pacific's reasons for not promoting him were a pretext for race discrimination. It is undisputed that Cyrus's applications were rejected because his experience was "Below Minimum Position Requirements," he was "Not Competitive with Best Candidates,"

the job was "Cancelled or Partially Cancelled," he was an "Unacceptable Candidate," or the hiring manager could not "Extend Relocation Benefits Under Current Policy or Business Conditions." Def.'s LR 56.1(a)(3) Stmt. ¶ 71.

Cyrus argues that these reasons are pretext because Hamilton exhibited racial animus against him and controlled Giandinoto's decisions with regard to promotions. Cyrus asserts that when he met Hamilton in 2007, Hamilton said, "You are not my choice and you're not my kind." Def.'s LR 56.1(a)(3) Stmt. ¶ 56. Cyrus also avers that, in 2009, Hamilton told him, "You're not going to move until you get my blessing to move. David Giandinoto is going to do what I recommend." *Id.* ¶ 60. Even if the Court were to assume that Hamilton's comments were evidence of racial bias and that Hamilton controlled Giandinoto's promotional decision making, Cyrus fails to point to any evidence that either Hamilton or Giandinoto were the decision makers with regard to any of the promotions Cyrus sought. *See generally* Def.'s LR 56.1(a)(3) Stmt.; Pl.'s LR 56.1(b)(3)(B) Stmt. Moreover, Cyrus has conceded that he is merely speculating that Giandinoto and Hamilton thwarted his advancement opportunities. *Compare* Def.'s LR 56.1(a)(3) Stmt. ¶ 65, *with* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 65. As such, Cyrus has not met his burden of bringing forth evidence from which a jury could reasonably infer that Hamilton influenced anyone to promote another candidate over Cyrus. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 59–60, 65–68.

## II. Retaliation for Complaining About Race Discrimination

Cyrus also claims Union Pacific retaliated against him for filing complaints of racial discrimination in violation of section 1981 and Title VII. The methods of proof and elements for establishing retaliation under these statutes are virtually identical. *See Johnson*, 91 F.3d at 940. To prove retaliation, a plaintiff may proceed under the well-known direct and indirect

methods of proof. *Burks v. Union Pac. R. Co.*, No. 14-2707, ___ F.3d ____, 2015 WL 4187738, at *5 (7th Cir. July 13, 2015). Again, Cyrus opts to proceed under the indirect method.

Under the indirect method, a plaintiff asserting retaliatory termination must show that: "(1) he engaged in a statutorily protected activity; (2) he met his employer's legitimate expectations, *i.e.*, he was performing his job satisfactorily; (3) he suffered a materially adverse action; and (4) he was treated less favorably than some similarly situated employee who did not engage in the statutorily protected activity." *Harper v. C.R. England, Inc*., 687 F.3d 297, 309 (7th Cir. 2010). Similarly, a plaintiff asserting a retaliatory failure-to-promote claim must establish he: (1) "engaged in statutorily protected activity;" (2) "applied for and w[as] qualified for the positions sought;" (3) was "rejected for those positions;" and (4) "the employer granted the promotions to others who did not engage in statutorily protected activity, and who were not better qualified than the plaintiff[]." *Burks*, 2015 WL 4187738, at *6.

Again, the first and third prongs are satisfied. It is undisputed that Cyrus engaged in statutorily protected activity by complaining to Rick Rivera, Assistant Vice President of Risk Management, and Melissa Schop, Manager of Equal Employment Opportunity and Affirmative Action, that Hamilton treated Caucasian employees better than African American employees in January 2012. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 37, 48. It is also undisputed that Cyrus was denied promotions throughout his tenure and was ultimately terminated. *Id.* ¶¶ 35, 66–67.

But Cyrus has not satisfied the second and fourth prongs of a *prima facie* case of retaliatory termination. As discussed above, Cyrus has not established that he was meeting Union Pacific's legitimate expectations. Furthermore, as for the fourth prong, it is undisputed that Fusek had not engaged in protected activity and was still placed on a DAP for failing to

conduct FTX tests, was also subjected to a truncated disciplinary process, and was terminated for failing to satisfy his DAP.  *See id.* ¶ 58.

Nor has Cyrus satisfied the second and fourth prongs of a *prima facie* case of retaliatory denial of promotions.  As discussed above, Cyrus has failed to establish that he was qualified for the positions he sought and that the promoted applicants were not better qualified than he. Furthermore, Cyrus fails to establish that any of the promoted applicants did not engage in statutorily protected activity.

Even if Cyrus could make out a *prima face* case, he has failed to create a triable issue regarding whether Union Pacific's reasons for denying him promotions and terminating him are a pretext for retaliation.  Cyrus does not point to any evidence that the decision makers who denied him promotions and terminated him were aware that he had complained about race discrimination or that those who were aware of his complaints influenced the decisions.  *See generally* Pl.'s LR 56.1(b)(3)(B) Stmt.; Def.'s LR 56.1(a)(3) Stmt.

In sum, Cyrus's retaliation claims suffer from many of the same shortcomings as his discrimination claims.   Union Pacific's summary judgment motion is granted as to these claims.

## III.  FRSA Retaliation

Finally, Cyrus argues that Union Pacific retaliated against him in violation of the FRSA. Specifically, he alleges that Union Pacific terminated him in retaliation for his complaints to Hamilton, Rick Rivera, and Melissa Schop that Hamilton had delayed medical treatment for crew members' injuries after a derailment.   *See* Def.'s LR 56.1(a)(3) ¶¶ 41, 46.[8]

---

[8] 49 U.S.C. § 20109(a)(4) provides that:  "A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for. . . reporting, in good faith, a hazardous safety or security condition . . . ."  49 U.S.C. § 20109(c)(1), in turn, states that:  "A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment."

Union Pacific initially argues that because Cyrus brought retaliation claims under Title VII and section 1981, his FRSA claim is barred by the FRSA's election-of-remedies provision. That provision states:  "An employee may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier."  49 U.S.C. § 20109(f).  Whether retaliation claims under Title VII or section 1981 seek protection for the "same allegedly unlawful act" as one under the FRSA is an open question in this Circuit.  This is an issue that the Court need not decide, however, because, in any event, Cyrus has failed to establish a genuine issue of material fact regarding his FRSA claim.[9]

"The FRSA provides that a rail carrier 'may not discharge . . . or in any other way discriminate' against an employee because he lawfully and in good faith provided information relating to, or directly assisted investigation of, conduct the employee reasonably believed violated a Federal law relating to railroad safety, or for 'reporting, in good faith, a hazardous safety or security condition.'"  *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 788 (8th Cir. 2014); *see* 49 U.S.C. §§ 20109(a)(1), (b)(1)(A).

A plaintiff bringing a FRSA retaliation claim must establish a *prima facie* case that:  (1) "he engaged in a protected activity;" (2) the employer "knew or suspected, actually or constructively, that he engaged in the protected activity;" (3) "he suffered an adverse action;" and (4) "the circumstances raise an inference that the protected activity was a contributing factor in the adverse action."  *Kuduk*, 768 F.3d at 789; *see* 49 U.S.C. § 42121(b)(2)(B)(i); 29 C.F.R. §

---

[9] Because 49 U.S.C. § 20109(f) does not state that the election of remedies is a jurisdictional bar, the Court agrees with other courts that have so held.  *See Koger v. Norfolk S. Ry. Co.*, No. 1:13–12030., 2014 WL 2778793, at *2 (S.D. W.Va. June 19, 2014); *Ratledge v. Norfolk S, Ry. Co.*, No. 1:12–CV–402, 2013 WL 3872793, at **4–7 (E.D. Tenn. July 25, 2013).

1982.104(e)(2).[10] An FRSA retaliation claim cannot survive, however, absent a showing that his superiors knew he had engaged in protected activity before taking any adverse action. *See, e.g., Kuduk,* 768 F.3d at 790 (granting summary judgment on an FRSA claim where plaintiff failed to show that the decision maker who terminated him was aware of his protected activity).

Assuming that Cyrus could establish that he had engaged in protected activity, he fails to create a triable issue as to the second and fourth prongs of the *prima facie* case. First, Cyrus admits that Hamilton, Rivera, and Schop never discussed Cyrus's complaints regarding delayed medical treatment with Giandinoto, the decision maker who terminated Cyrus, or any other person who had input into the decision to place Cyrus on a DAP. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 43–44, 46–47, 51. Given this admission, there is no evidence of actual knowledge.

Cyrus nonetheless attempts to establish that Giandinoto had constructive knowledge of Cyrus's complaint. In support, Cyrus states that "Mr. Giandinoto was involved with the derailment described as a big-deal and in communication with Hamilton." *Id.* ¶ 46. Because Cyrus does not provide a citation to the record in support of that statement, he has failed to comply with Local Rule 56.1, and this statement cannot aid him. In addition, Cyrus states that "Giandinoto previously admonished Cyrus for manager's reporting complaints about other managers," and cites his deposition in support. *See id.* However, the fact that Giandinoto told Cyrus in 2010 to talk to a manager directly about an issue rather than calling a hotline to report an interpersonal conflict does not raise a reasonable inference that Giandinoto suspected that Cyrus had complained to Hamilton about delays in medical treatment after the derailment in 2011. Beyond his own speculation, Cyrus does not point to any evidence from which a jury

---

[10] If a plaintiff satisfies this *prima facie* case, the burden shifts to Union Pacific to show "by clear and convincing evidence" that it would have taken the same action in the absence of the protected activity. *See* 49 U.S.C. § 20109(d)(2)(A)(i) (stating that a FRSA retaliation action "shall be governed under the rules and procedures set forth in section 42121(b)"); 49 U.S.C. § 42121(b)(2)(B) (discussing the burden-shifting framework).

could reasonably infer that Giandinoto (or any person involved in placing Cyrus on a DAP) suspected or had constructive knowledge that Cyrus had engaged in any purported protected activity under the FRSA. Thus, Cyrus has not created a genuine issue of material fact regarding the second prong.

Second, Cyrus has failed to demonstrate that the circumstances raise an inference that the protected activity was a contributing factor in the adverse action. A contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." 29 C.F.R. part 1982 (2010). Evidence which may indicate a link between the protected activity and the allegedly adverse actions include: "temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward the complainant after he or she engages in protected activity." *Ray v. Union Pac. R.R. Co.,* 971 F. Supp. 2d 869, 885 (D. Iowa 2013) (quotation omitted).

Cyrus alleges that the last element of the *prima facie* case is satisfied because only five weeks elapsed between the time of his complaint in September 2011 and the audit of his FTX reporting in November 2011. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 27, 41; Def.'s Ex. D, Foresman Decl. ¶ 5. However, Cyrus admits that every manager is regularly audited to ensure FTX compliance. Def.'s LR 56.1(a)(3) Stmt. ¶ 26. He also admits that the audit revealed that he failed to meet many FTX requirements. *Id.* Furthermore, Cyrus has not pointed to any evidence to support his assertion that, at the time the audit was performed, Foresman knew the audit would show Cyrus's FTX noncompliance as a foregone conclusion. Given the state of the record, the

fact that Cyrus was audited does not create a reasonable inference that his complaint was a contributing factor to his termination.

Moreover, Cyrus was not placed on a DAP until February 2012, five months after his complaint to Hamilton and Rivera and two months after his complaint to Schop. *Id.* ¶¶ 31, 41, 46. Cyrus was not terminated until June 2012, nine months after his complaint to Hamilton and Rivera and five months after his complaint to Schop. *Id.* ¶¶ 35, 41, 46. While the Seventh Circuit has not yet determined whether temporal proximity alone is sufficient to satisfy the fourth prong of an FRSA claim, other courts provide guidance on the matter. One court has held that a reasonable jury could infer retaliation from a temporal gap of a few days. *See Araujo v. New Jersey Transit Rail Opers., Inc.,* 708 F.3d 152, 160 (3d Cir. 2013). Another court has held that no reasonable jury could infer retaliation from a two-month gap. *See Kuduk v. BNSF Ry. Co.,* 980 F. Supp. 2d 1092, 1101 (D. Minn. 2013) ("[A] plaintiff cannot establish a *prima facie* case of retaliation based on temporal proximity alone when the termination occurred two months after the alleged protected conduct."), *aff'd*, 768 F.3d 786 (8th Cir. 2014). Here, the Court concludes that the two- to five-month period between the complaint and the DAP and the five- to nine-month period between the complaint and termination do not raise an inference that Cyrus's protected activity was a contributing factor in his termination. Given the attenuated nature of the temporal gaps, no reasonable jury could infer that Cyrus was placed on a DAP and terminated based on his complaint regarding delayed medical care.

Cyrus thus has failed to create a genuine issue as to material fact regarding the second and fourth prongs of this test. Even if he could make out a *prima facie* case, however, Union Pacific has established by clear and convincing evidence that it would have terminated Cyrus absent the protected activity. Cyrus concedes that the audit showed his noncompliance with

FTX requirements and that he failed to satisfy the terms of his DAP. *Id.* ¶¶ 35, 58. There is no evidence that Giandinoto, Foresman, or Smith had any knowledge, constructive or otherwise, of the protected activity. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 43–44, 46–47, 51. Moreover, it is undisputed that Fusek had not engaged in protected activity under the FRSA and was terminated in the same way as Cyrus. *Id.* ¶¶ 29, 58; Def.'s Ex. C, Smith Decl. ¶ 19. Accordingly, the Court grants Union Pacific's summary judgment motion as to Cyrus's FRSA claim.

## <u>Conclusion</u>

For the reasons set forth above, the Court grants Union Pacific's motion for summary judgment [81]. Civil case terminated.

**SO ORDERED**  **ENTER:** 9/24/15

_____

**JOHN Z. LEE**
**United States District Judge**